In re Herbert MANDELL, Bankrupt.

John BOYAJIAN, Trustee, Plaintiff,

v.

FINANCEAMERICA CORPORATION, Defendant.

Bankruptcy No. 78–163.

United States Bankruptcy Court,
D. Rhode Island.

Nov. 21, 1980.

Richard R. Del Sesto, Cranston, R. I., for debtor.

John Boyajian, Providence, R. I., Trustee.

John F. McDonough, Providence, R. I., for defendant.

## DECISION

ARTHUR N. VOTOLATO, Jr., Bankruptcy Judge.

Heard on September 17, 1980 on the Trustee's complaint against FinanceAmerica, which alleges that the defendant violated the Rhode Island Secondary Mortgage Loans Act, R.I.Gen.Laws § 19–25.2–1 et seq., and asks that the loan in question be declared void.

The following discussion constitutes findings of fact and conclusions of law as required by Bankruptcy Rule 752.

In late 1976, the bankrupt, Herbert Mandell, responded to a newspaper advertisement placed by one William J. McGovern,

regarding a refinancing of his home mortgage, and McGovern informed Mandell that he could not offer financing at that time. About a year later Mandell again contacted McGovern, and again McGovern concluded that he could not help Mandell directly, but told him that he would discuss the possibility of obtaining a loan with FinanceAmerica. McGovern spoke with Kenneth Periera, the Branch Manager of FinanceAmerica in Warwick, Rhode Island, whereupon Periera telephoned Mandell, took a credit application, and told Mandell that a real estate appraisal would be required in order to continue processing the loan application.

Mandell agreed, and Periera contacted Herbert Mason, who had been doing appraisals for FinanceAmerica for about ten years, to appraise Mandell's real estate. A bill for the appraisal in the amount of $50 was sent by Mason to Mandell, who paid it.

After resolving a number of difficulties due to encumbrances on the property, a second mortgage in the amount of $14,-751.91 was approved. Of this amount, checks totaling $13,530.95 were sent to Mandell's creditors. FinanceAmerica retained $762.00 for life insurance and other fees, which are not contested. Also at the loan closing, a check in the amount of $458.96 was given to Mandell who immediately went across the street to an office of Industrial National Bank, cashed the Finance America check, purchased a bank check in the amount of $300, and returned to the FinanceAmerica office. William McGovern's name was typed on the check at the FinanceAmerica office, and this check, representing McGovern's finder's fee for placing the loan was left at the FinanceAmerica office and McGovern picked it up shortly thereafter.

When Mandell subsequently complained that he had been overcharged for the appraisal and that he should not have had to pay a finder's fee, he was requested by FinanceAmerica to sign a release, and he did so. The release was given for one dollar "and other good and valuable consideration", which FinanceAmerica asserts consisted of persuading McGovern and Mason to return $300 and $35, respectively, to Mandell. It is agreed that these amounts were returned to Mandell by Messrs. McGovern and Mason, in whose favor Mandell signed additional releases. Whether the $1 was paid is disputed, but matters not to our resolution of this case.

The Trustee alleges the following violations of the Secondary Mortgage Loans Act: (1) FinanceAmerica failed to furnish the borrower with an accurate itemized schedule of charges; (2) FinanceAmerica demanded and authorized the payment and collection of unauthorized charges; (3) FinanceAmerica demanded and authorized the payment and collection of charges in an amount greater than that authorized; (4) FinanceAmerica failed to furnish a copy of a schedule of the maximum amounts which may be charged to an applicant for a secondary mortgage loan at the time when the application for the loan was made; and (5) FinanceAmerica or other persons demanded, collected or received, directly or indirectly, unauthorized charges and greater amounts for authorized charges than permitted.[1] Now the Trustee asks this Court to declare the loan void and to deny Finance America the right to collect "any principal, interest or charges whatsoever."

FinanceAmerica denies all the above allegations, except that it failed to furnish an up-to-date schedule of charges. As to this allegation, FinanceAmerica maintains that the failure to furnish the proper schedule was a bona fide error and excused pursuant to § 19-25.2-29. FinanceAmerica further contends that the releases signed by Mandell in favor of FinanceAmerica, McGovern, and Mason, shield it from this suit, and that its loan is not void under § 19-25.2-29 because it has not been convicted of a misdemeanor, and that this section requires such a conviction as a condition precedent to avoiding the loan.

Finally, the Trustee counters that the releases in this case are voidable preferences under § 67(d) of the Bankruptcy Act. 11 U.S.C. § 107(d) (1976).

---

1. The Trustee has withdrawn a further allegation that FinanceAmerica charged an interest rate in excess of that permitted by R.I.Gen. Laws § 19-25.2-23.

We shall discuss each of these factual and legal issues separately.

### I. *Failure to Furnish the Borrower With an Accurate Schedule of Charges*

The Secondary Mortgage Loans Act requires the Director of Business Regulation to distribute to every lender licensed under the Act "an itemized schedule of the maximum amounts which may be charged to an applicant for a secondary loan for costs, fees, services, collection charges, late charges and all other reasonable expenses...." R.I.Gen.Laws § 19–25.2–24. The lender is to furnish a copy of this schedule to the borrower when the application for the loan is made. *Id.*

The first schedule of charges published under the Act became effective on September 1, 1966, and listed the maximum charges as follows: $15 for a property appraisal, $3 for a credit investigation, $25 for a title search and $50 for attorney's fees. On September 3, 1975 an amended schedule became effective, and all licensees were duly notified by the Director of Business Regulation. The new schedule increased the maximum amounts which could be charged for a title search and for attorney's fees to $75 each.

The Mandell loan is dated February 3, 1978, and although this loan occurred more than two years after the new regulations were promulgated, Mandell was given a copy of the 1966 schedule of maximum charges. When the Legislature enacted this section, it intended that the borrower be furnished with an accurate, up–to–date schedule. A schedule of inaccurate information is more misleading than no schedule at all.

However, FinanceAmerica makes note of the fact that the new regulations increased the maximum fees that a lender in a secondary loan situation could charge. Since "[t]he obvious intent of this schedule of maximum permissible charges is to put the borrower on notice as to the maximum fee ...," Defendants Memorandum at 6, and

since it charged Mandell amounts greater than those listed on the 1966 schedule, FinanceAmerica argues that Mr. Mandell was in fact put on notice that he might be being overcharged.

■ This argument is unique and innovative, but not persuasive. The fact that a borrower may have sufficient information to be on actual or constructive notice that he is being overcharged does not relieve the lender of its affirmative duty under the Act to provide an accurate schedule of maximum charges. The language employed by the Legislature is unambiguous, and its clear meaning should be given effect.

■ FinanceAmerica also contends that its failure to update the maximum fee schedule was a "bona fide error" and therefore excused in civil actions pursuant to R.I.Gen.Laws § 12–25.2–29. It argues that its error was "in or with good faith; ... without deceit or fraud," Black's Law Dictionary (4th Ed. 1968), and that this was the standard intended to be applied by the Legislature when it enacted that section. This contention is rejected, given the overriding legislative concern of protection of consumer–borrowers expressed in the Act. In this matter the Court is in agreement with the decision in *Mirabel v. General Motors Acceptance Corp.*, 537 F.2d 871 (7th Cir. 1976).[2] In that opinion construing the Federal Truth in Lending Act, a statute with quite similar provisions and the same legislative intent as the Rhode Island Secondary Mortgage Loans Act, the court held that "[a] bona fide error is an error made in the course of a good faith attempt at compliance." *Id.*, at 878.

■ In this case there is no evidence that FinanceAmerica made such "a good faith attempt at compliance." More than two years had passed since the new regulations became effective, and the defendant was so casual in the achievement of good faith compliance that the error was eventually called to Mr. Periera's attention by the

---

**2.** There appear to be no Rhode Island cases construing the phrase "bona fide error." I agree with the defendant that the case cited by the plaintiff, Plaintiff's Reply Memorandum at

2, *Masurel Mills, Inc. v. Dubois*, 100 R.I. 48, 210 A.2d 864 (1965), construing the words "bona fide attempt" in a Workmen's Compensation statute has no applicability to the case at bar.

manager of a competing finance company. There is no evidence of procedures established by the defendant to periodically check the accuracy of its forms, despite heavy government regulation of the finance industry. Notwithstanding the fact that the defendant received notice of the amended regulations, there is no evidence of any action by FinanceAmerica to bring its forms into compliance. In no way has this defendant demonstrated a good faith attempt at compliance with the statute.

## II. Demand of Payment and Collection of Unauthorized Charges

The Act states that "[n]o licensee or any other person shall demand, collect or receive from any applicant for a secondary mortgage loan, directly or indirectly, any other charges . . . than those permitted by said schedule." R.I.Gen.Laws § 19–25.2–24. As previously noted the schedule includes "the maximum amounts which may be charged to an applicant for a secondary mortgage loan for costs, fees, services, collection charges, late charges and all other reasonable expenses which may be incurred by such applicant in connection with a secondary mortgage loan." Id. The maximum charges allowed pursuant to the amended regulation, in addition to unspecified amounts for insurance charges, and filing and recording fees are: $15 for a property appraisal; $3 for a credit investigation; $75 for a title search; and $75 for attorney's fees. There are no other authorized charges. Thus, if a finder's fee was demanded, collected or received directly or indirectly by FinanceAmerica, it has violated the provisions of the Act.

William McGovern, who placed this loan, shares his office with Mr. Mason, who appraised Mr. Mandell's property. Both McGovern and Mason had an on–going business relationship with FinanceAmerica. Mason had an agreement with FinanceAmerica whereby he was paid finder's fees by FinanceAmerica for loans he placed with the company. While Mr. McGovern had no such agreement, he acknowledged that he had placed loans with the company in the past. At an early stage in this loan transaction McGovern told Mr. Periera, the FinanceAmerica Branch Manager, that he expected to receive a $300 fee for his efforts.

At the loan closing Mandell was given a check for $458.96 as part of the disbursements. At the same time, Mandell was told to go to a nearby bank, cash the check he was given, and obtain a bank check in the amount of $300. When Mandell returned to the FinanceAmerica office, McGovern's name was typed on the $300 check and retained by the defendant to be picked up by McGovern.

Based on these facts and the testimony regarding the business relationship between Messrs. Mason and McGovern and FinanceAmerica, this Court finds that the defendant did indirectly demand from the applicant an unauthorized charge. I cannot find on the evidence before me that FinanceAmerica directly collected or received an unauthorized charge, but such a finding does not appear to be necessary to constitute a violation of this section of the Act.

## III. Demand of Payment and Collection of Charges in an Amount Greater Than That Authorized

The Secondary Mortgage Loans Act states that "[n]o licensee or any other person shall demand, collect or receive . . . directly or indirectly . . . any greater amounts for authorized charges, than those permitted by said schedule . . . ." R.I.Gen. Laws § 19–25.2–24. The amended schedule filed in 1975 provides for a maximum appraisal charge of $15.

When applying for this loan, Mandell was told that an appraisal would be necessary before his application could be processed. Mr. Periera of FinanceAmerica called Mason to do the appraisal. Mason billed Mandell $50 for the appraisal, and Mandell paid it. Although the defendant asserts that Mason was the agent of Mandell, reason does not support that contention. Mason had been doing appraisals for FinanceAmerica on a regular basis for ten years, and had an agreement with the company for finder's fees, and was at all times during this transaction the agent of Finance

America. Therefore, the conclusion is rather inescapable that FinanceAmerica, directly or indirectly, demanded, collected or received from Mandell an amount greater than that authorized.

IV. *Failure to Furnish a Schedule of Maximum Charges at the Time the Application for Loan is Made*

The Act provides that "[e]very licensee shall furnish to every applicant for a secondary mortgage loan a copy of said schedule at the time *when such application is made.*" R.I.Gen.Laws § 19–25.2–24 (emphasis added).

It is undisputed that the only copy of the maximum fee schedule given to Mandell was on the reverse side of the Federal Disclosure Statement. This document was not furnished to Mandell until the loan closing. FinanceAmerica argues that the application is not "made" until "all matters pertinent to [the application] have been cleared and the loan is actually ready to be made." Defendant's Memorandum at 11.

■ As noted in a recent opinion of this Court dealing with the construction of this Act,[3] courts are required to give the language of a statute its ordinary and customary meaning. Accordingly, "application" is defined as a "request" or "petition." Websters New Collegiate Dictionary (7th Ed. 1976). Black's Law Dictionary (Rev. 4th Ed. 1968) states that application means "the act of making a request for something." The defendant equates the act of "approving an application" with the act of "making an application." They are not the same thing. By the time a loan is approved, the borrower normally is out of the market and is no longer shopping around for other credit terms. It is clear and unambiguous that

an application for a loan is made when that loan is first requested.

■ This is not to suggest, however, that the Act should read literally *reductio ad absurdum.* Obviously, it is an unreasonable construction to require a written schedule when an application is taken by telephone. In such a case, a schedule should be provided as soon as possible either by mail or by requesting the borrower to come to the lender's office to pick up a schedule. There do not appear to be any such extenuating circumstances in the instant case.

■ For the foregoing reasons, the Court finds that FinanceAmerica violated the Secondary Mortgage Loans Act by not timely furnishing the borrower with a schedule of maximum fees.

V. *Persons Other Than FinanceAmerica Demanded, Collected or Received, Directly or Indirectly, Unauthorized Charges and Greater Amounts for Authorized Charges Than Permitted*

■ FinanceAmerica has already been found to have violated the Secondary Mortgage Loans Act by these very practices. The plaintiff now contends that this Court should also find that McGovern and Mason (not parties herein) violated the Act. This issue is not subject to consideration here. Any alleged violations of the statute by McGovern and Mason would have to be the subject of an action in which they are named as defendants.

VI. *The Release Signed by Mandell in Favor of FinanceAmerica is a Voidable Preference Under § 67(d) of the Bankruptcy Act*

On April 24, 1978, Mandell entered into an agreement with FinanceAmerica releas-

---

**3.** Our research, as well as that of the parties, discloses no cases by either the Rhode Island Supreme Court or the Rhode Island Superior Courts construing the Secondary Mortgage Loans Act. The only published opinion under this Act is by this Court. *Boyajian v. Union Capital Credit Union (In re Harrington),* 6 B.R. 655, 1 R.I. Lawyer's News 277 (D.R.I. 1980). In that case we noted that

[i]n construing a statute where the intent of the legislature is in issue, a court must con-

sider the statute in its entirety, viewing the language in light of the purpose and nature of the legislation.... [L]anguage which is not defined in the statute should be given its ordinary and customary meaning in light of the purposes which motivated the enactment of the statute.... At 657–658.

We shall utilize these same principles in this decision.

ing the latter from all claims or causes of action arising out of the loan transaction. On May 23, 1978, less than one month later, Mandell filed a Chapter XIII Petition in this Court.[4] The defendant contends that this agreement with Mandell releases it from all claims in this case and leaves its loan intact. The Trustee, on the other hand, argues that this agreement is a voidable preference under § 67(d) of the Bankruptcy Act, 11 U.S.C. § 107(d) (1976), and should not be given effect.

The Bankruptcy Act states that

[e]very transfer made and every obligation incurred by a debtor within one year prior to the filing of a petition initiating a proceeding under this Act by or against him is fraudulent (a) as to creditors existing at the time of such transfer or obligation, if made or incurred without fair consideration by a debtor who is or will be thereby rendered insolvent, without regard to his actual intent. 11 U.S.C. § 107(d)(2).

The Bankruptcy Act also provides that "[a] transfer made or an obligation incurred by a debtor adjudged a bankrupt under this Act, which is fraudulent under this subdivision d against creditors of such debtor having claims provable under this Act, shall be null and void against the Trustee . . . .". *Id.*, at § 107(d)(6).

■ Therefore, for the release to be deemed fraudulent and declared a voidable preference, four requirements have to be met:

a) there must be a "transfer" made or an obligation incurred by the debtor;

b) within one year of the filing of a petition under the Bankruptcy Act;

c) made or incurred without fair consideration;

d) by a debtor who is or will be thereby rendered insolvent.

It is undisputed that the Chapter XIII petition was filed within one year of the release. It is also clear that the debtor was insolvent at the time he signed the release.

A person is considered insolvent "when the present fair salable value of his property is less than the amount required to pay his debts." *Id.*, at § 107(d)(1)(d). Mandell clearly meets this standard, owning real estate valued at $48,500 and no other non-exempt assets, and owning debts amounting to over $70,000. The release of his rights to sue FinanceAmerica was a "transfer" by Mandell under the Bankruptcy Act. *See, Remington on Bankruptcy,* § 1642.1 (6th Ed. 1957); *Sullivan v. B. S. Canner, Inc.,* 33 F.Supp. 500 (D.Mass.1940).

The issue on which the parties disagree is whether the release was supported by "fair consideration." The release was given for $1 "and other good and valuable consideration." Whether the $1 was actually given to Mandell is disputed. FinanceAmerica claims that the "other good and valuable consideration" was its action in persuading McGovern and Mason to make payment of $300 and $35, respectively, to Mandell.

■ Fair consideration is given (1) when, in good faith, in exchange and as a fair equivalent therefor, property is transferred or an antecedent debt is satisfied, or (2) when such property or obligation is received in good faith to secure a present advance or antecedent debt in an amount not disproportionately small as compared with the value of the property or obligation obtained. 11 U.S.C. § 107(d)(1)(e).

In this case, the $335 refunded to Mandell was only that to which he was entitled, and that which had been wrongfully extracted from him in the first place. Under the Bankruptcy Act, this is not fair consideration, and neither are the amounts $300 and $35 respectively, since these numbers are "disporportionately small as compared to the value" being given up by Mandell.

■ On the same basis, the issue whether the $1 was actually paid is not deserving of further comment. For the reasons stated, the release to FinanceAmerica constitutes a voidable preference, and is null and void as to the Trustee.

---

4. The Court converted that proceeding to a Chapter VII liquidation proceeding on May 30, 1980.

### VII. *The Secondary Mortgage Loan is Void*

The penalty provision of the Secondary Mortgage Loans Act provides that

> [a]ny person ... who shall violate or participate in the violation of any of the provisions of this chapter, shall be guilty of a misdemeanor .... Any secondary mortgage not invalid for any other reason, in the making and collection of which any act shall have been done which constitutes a misdemeanor under this section, shall have no right to collect or receive any principal, interest, or charges whatsoever.... R.I.Gen.Laws § 19–25.2–29.

The Trustee requests the Court to declare this loan void because of FinanceAmerica's violation of the Act. FinanceAmerica argues that conviction of a misdemeanor is a condition precedent to the commencement of such a suit by the Trustee, and that there has been no such conviction in this case.

That same issue was decided by this Court in *Boyjian v. Union Capital Credit Union (In re Harrington)*, 6 B.R. 655, BK–7900378 (B.C.R.I.1980), where it was held that the civil and criminal remedies in § 19–25.2–29 were distinct and independent, and that misdemeanor conviction is not a necessary precedent to the maintenance of a civil action.

Since FinanceAmerica has violated the provisions of the Rhode Island Secondary Mortgage Loans Act by (1) failing to furnish the borrower with an *accurate* schedule of maximum charges, (2) demanding the payment of unauthorized charges, (3) demanding the payment and collection of charges greater than those authorized, and (4) failing to furnish borrower with a copy of the schedule of maximum charges when the loan application was made, and (5) that thereby FinanceAmerica has committed such acts as would constitute a misdemeanor under the Act, the loan in question is void. FinanceAmerica is therefore denied any right "to collect or receive any principal, interest or charges whatsoever."

Judgment should be entered in accordance with the terms of this decision within seven (7) days. The Judgment shall include a statement of all principal, interest, and other charges received by the defendant under the loan in question, together with an order that said sums be returned to the Trustee forthwith.